(241 P.3d 988)
No. 103,205

NEWCASTLE HOMES, LLC, *Appellant,* v. DENNIS F. THYE AND
DIANNA L. THYE, *Appellees,* and THOMAS J. DRESSLER and
ALPHA HOMES, LLC, *Defendants.*

—

Opinion filed October 15, 2010.

*Jeffrey A. Sutton,* of Gibbon, Sutton & Sonntag, L.L.C., of Basehor, for appellant.

*Michael Crow*, of Crow & Associates, of Leavenworth, for appellees.

Before HILL, P.J., GREEN and BUSER, JJ.

GREEN, J.: Newcastle Homes, LLC (Newcastle), appeals from the trial court's decision granting summary judgment to Dennis Thye and Dianna Thye on Newcastle's breach of contract, fraud, and tortious interference claims. For the following reasons, we affirm the trial court's grant of summary judgment to the Thyes: (1) Newcastle failed to provide the May 2005 sales contract and the May 2005 builders contract on which Newcastle's claims centered; (2) Newcastle and the Thyes entered into cancellation and mutual release agreements that rescinded the May 2005 sales contract on which Newcastle's causes of action were based and released the parties from any liability and claims for damages arising from the contract; (3) Newcastle did not properly plead its fraudulent inducement claim with particularity, as required by K.S.A. 60-209(b); (4) Newcastle's evidence did not establish a genuine issue of material fact as to the elements of fraud; and (5) Newcastle did not manifest its intention to avoid the cancellation and mutual release agreements to the Thyes within a reasonable time. Accordingly, we affirm.

On May 17, 2005, the Thyes entered into a residential new construction sale contract with Newcastle for the purchase of land and the construction of a house at 2250 Valley View Drive in Tonganoxie, Kansas, for the price of $215,900. The Thyes put down $5,000 as earnest money towards the purchase price of the home. The initial closing date for the contract was set for September 30, 2005.

John W. Barnes, Sr., was the principal and owner of Newcastle. Barnes started Newcastle to function as a general contractor for the sales and construction of custom-built homes. In May 2005, Newcastle entered into a contract with Alpha Homes, LLC (Alpha Homes), to provide and oversee the personnel and manpower necessary to construct custom-built homes, including the construction of the house at 2250 Valley View Drive.

Thomas Dressler was the managing partner and authorized agent of Alpha Homes at all times relevant to the contract with

Newcastle. According to Barnes, Dressler drew the construction plans and front elevation drawings for the home at 2250 Valley View Drive. Moreover, Dressler compiled a handwritten materials list and identified and provided quotes for costs and allowances to be included in the agreement for the house at 2250 Valley View Drive. Barnes stated in his affidavit that in Newcastle's contract with Alpha Homes, Alpha Homes reserved for itself the exclusive authority to direct, control, and supervise the working assignments for personnel necessary for construction purposes. In addition, Barnes stated that Dressler made all of the decisions concerning the assignment of the workers for the construction of the house at 2250 Valley View Drive.

According to Barnes, as construction began on the house at 2250 Valley View Drive, questions immediately arose concerning the adequacy of the lot. After testing was done on the property, it was determined that the property was unstable and unsuitable for construction purposes in its present condition. According to Barnes, because a contractor was called in to compact the subsoil to achieve the appropriate structural integrity necessary to support the foundation for the house, the extension of the original closing date became necessary.

According to Barnes, during the second and third week of December 2005, he began noticing that individual and overall phases of construction for the house at 2250 Valley View Drive were taking longer than anticipated and many of them were not being completed. Barnes stated that he discussed this issue repeatedly with Dressler, but that Dressler always made excuses. According to Barnes, he believed that the Thyes had apparently struck an agreement with Dressler for changes in the design and additions to the house. Barnes asserted that there were material changes made, without his knowledge or consent, during the construction period for the house, which required a substantial amount of time and included a new backyard fence, a deck roof, sheet rock and insulation installation in the basement, stereo wiring throughout the house, alteration of the deck design, additional windows installed, and additional bricking of the front elevation of the house.

According to Dressler's affidavit, however, during the construction of the house, Newcastle constantly shifted Alpha Homes' employees from house to house, which led to delayed completion dates for the house at 2250 Valley View Drive. Dressler further stated that Barnes would initiate discussions with him about increasing costs on the property and attempted on several occasions to unnecessarily increase labor costs.

On August 29, 2005, the Thyes and Newcastle agreed to extend the closing date to December 30, 2005. In December 2005, Newcastle requested and obtained an agreement by the Thyes to extend the closing date to January 23, 2006.

According to the Thyes, in November 2005, they started D & D Homes, LLC (D & D Homes), for the purpose of paying for the expenses of construction and improvements on the property at 2250 Valley View Drive. The Thyes paid approximately $21,000 in expenses and improvements on the property out of D & D Homes' checking account and their own personal accounts. The Thyes stated that they painted the inside of the property at 2250 Valley View Drive in order to speed up the completion date. According to Dressler, the Thyes were greatly involved in attempting to complete the property by the closing dates. Dressler stated that the Thyes did not attempt to delay or influence the delays in the completion of the property.

According to affidavits filed by the Thyes, in January 2006 they formed the opinion that the property would not be completed by January 23, 2006. The Thyes asserted that Barnes came to the property in January 2006 while they were painting and loudly complained that the property would not be completed by the January 23, 2006, closing date. The Thyes then decided that if the property was not completed by January 23, 2006, they would cancel the contract and find another property.

According to Barnes' affidavit, Dressler approached Barnes around January 17, 2006, and demanded his scheduled payment under his contract with Newcastle, even though the required work had not been completed. Barnes stated that Dressler told him that Alpha Homes did not have the money to pay its employees and that if Barnes did not make the scheduled payment, he would pull

all of his employees off the project. According to Barnes, he paid Alpha Homes the requested payment, but Dressler still pulled all of his employees from the construction project on January 18, 2006.

On January 21, 2006, Newcastle requested a third extension of the closing date to February 8, 2006, but the Thyes would not agree to the extension. On January 23, 2006, the property was not completed, and closing did not occur. According to Dianna, Newcastle began to show the property to other buyers in January 2006. Nevertheless, Barnes stated in his affidavit that the realtors, on their own initiative, showed the property and that they had never contacted him or requested permission to show the property. On January 24, 2006, the Thyes entered into a real estate contract with Donal Dominick for the purchase of an unimproved lot in Jarbalo Estates in Tonganoxie.

According to Barnes, around January 19, 2006, the Thyes' realtor contacted him and said that if Newcastle did not let the Thyes out of their contract because of Newcastle's unwillingness or inability to complete the construction of the home, then they would place a lien on the property for the expenses that they had incurred in relation to the construction of the home. Barnes stated that he met with Dennis Thye and the Thyes' realtor around January 20, 2006, and declined to rescind the contract. Instead, Barnes offered the Thyes a $3,000 reduction in the contract price for the house.

On February 13, 2006, Newcastle, Barnes, and the Thyes signed two cancellation and release agreements that cancelled and rescinded the rights, duties, and obligations under the Residential New Construction Contract. Specifically, Newcastle, Barnes, and the Thyes agreed that the contract for the sale and purchase of the property at 2250 Valley View in Tonganoxie, Kansas, "is canceled and the parties release all of their rights and interest in the Contract." The other agreement stated that the Thyes had paid others besides the seller to make upgrades, additions, and improvements to the home that the seller had built at 2250 Valley View Drive in an amount the Thyes claimed to be $21,916.84, including $5,000 in earnest money that was paid when the Residential New Construction Contract was signed.

One of the cancellation and release agreements contained the following provisions relating to the rescission of the Residential New Construction Contract and the payment of $20,000 to the Thyes:

"1. The Residential New Construction Contract and any additions, addendums and extensions thereto are hereby cancelled and rescinded.

"2. Each party hereby releases the other from any liability, claim for damages and damages, that they now have or may in the future have against any party to this Agreement arising out of the Residential New Construction Contract dated May 17, 2005, and any additions, addendums or extensions thereto and for any items the Buyers added to said house.

. . . .

"4. The Seller will pay to the Buyers the sum of $18,000 $20,000.00 [amended/initialed by parties] upon execution of this Agreement by all parties. All upgrades, additions and other improvements to the home located at 2250 Valley View Drive, Tonganoxie, Leavenworth County, Kansas 66086, shall remain with the real property and become the property of the Seller. This includes the wooden fence that fences a portion of the yard at 2250 Valley View Drive, Tonganoxie, Leavenworth County, Kansas 66086."

On February 13, 2006, Newcastle presented a $20,000 check to the Thyes as payment in full for the Thyes' interest in the property.

The construction of the home at 2250 Valley View Drive was completed in March 2006 by C.J. McDaniel. According to Barnes, he did not take any steps to secure the property at 2250 Valley View Drive to the exclusion of Dressler until March 3, 2006, after receiving a letter from an attorney on behalf of Alpha Homes making certain demands against Newcastle. Barnes stated that by the terms of the subcontractor's agreement with Dressler, the agreement did not terminate until completion of the construction by Alpha Homes, a condition that never occurred. Thus, according to Barnes, Alpha Homes never severed its contractual ties with Newcastle because it never completed its obligations under the subcontractor's agreement.

According to Barnes, the Thyes never completed the painting at the house, and the painting that they did complete on the interior of the house was of such a shoddy condition that the entire interior of the house had to be professionally repainted. Newcastle sold the home on March 16, 2006, for $229,950. Barnes alleged that as a

result of rescinding the contract, he sustained damages in excess of $63,300 that were used "to pay for the extras that had been improperly included in the construction of the Newcastle home and to pay contractors to come in and finish the work that Alpha [H]omes and/or Thomas Dressler failed to complete."

According to the Thyes, Dressler came to them in February 2006 and stated that he was no longer under contract with Newcastle and that he had been locked out of the property. Dianna stated in her affidavit that Dressler requested that he be allowed to construct another house for them personally. According to both the Thyes and Dressler, although they had many conversations before being released from their contract with Newcastle, they never discussed the construction of a separate house aside from the property at 2250 Valley View Drive.

According to Dominick, however, he had a conversation on January 14, 2006, with Dennis about purchasing the lot in Jarbalo Estates. Dominick stated in his affidavit he told Dennis that in order to purchase the lot, the Thyes needed to be prepared to close on the lot within 30 days from when they entered into a contract. Dominick further stated that Dennis assured him that they would be able to close on the lot within 30 days, that they already had a builder, whom Dennis identified as Dressler, that they had contracted with Dressler to build the house, and that they needed only to contact their mortgage company to finalize the paperwork.

According to affidavits filed by the Thyes, in February 2006, after being released from their contract with Newcastle, they entered into an oral contract with Dressler for the construction of a new house on the lot purchased in Jarbalo Estates. The Thyes closed on the property in Jarbalo Estates on March 3, 2006. Dressler began construction on the house in Jarbalo Estates in March 2006, and the Thyes moved into the house in October 2006.

In June 2007, Newcastle sued the Thyes, Dressler, and Alpha Homes. In an amended petition, Newcastle asserted claims of breach of contract, fraud, tortious interference with a contract, and tortious interference with expected business relations against the Thyes. In addition, Newcastle asserted claims of breach of contract, fraud, tortious interference with a contract, breach of fiduciary

duty, and violation of the Kansas Consumer Protection Act against Dressler and Alpha Homes. Although Newcastle moved to file an amended complaint in November 2008, the trial court never granted Newcastle's motion. The Thyes filed an answer to Newcastle's petition and asserted counterclaims of breach of contract and negligent misrepresentation against Newcastle.

In October 2008, the Thyes moved for summary judgment on all of Newcastle's claims. The Thyes asserted the following arguments as to why Newcastle had not established a genuine issue of material fact on the claims against them: (1) Newcastle had cancelled the May 2005 contract with the Thyes and released the Thyes from all liability stemming from the contract; (2) Newcastle suffered no damages as a result of the alleged breach of contract by the Thyes and in fact sold the property for $14,050 more than was due under the contract; (3) Newcastle failed to plead its fraud claim with particularity; (4) Newcastle could not prove its fraud claim because the Thyes never made a false representation of material fact or attempted to induce Newcastle to rely upon any of their statements; and (5) the Thyes did not tortiously interfere with any existing or future contracts of Newcastle.

In responding to the Thyes' motion for summary judgment, Newcastle did not respond specifically to each of the Thyes' 43 contentions of uncontroverted facts. Instead, the Newcastle made its own statements of fact, some of which were additional statements of fact and some of which allegedly controverted various paragraphs of the Thyes' uncontroverted facts. Newcastle argued that it had created genuine issues of material fact as to all of its claims against the Thyes.

At the hearing on the Thyes' motion for summary judgment, the trial court inquired and the parties agreed that Newcastle's claims centered on whether there were tortious acts committed by the Thyes, Dressler, and Alpha Homes that caused a breach of the May 2005 contract. The trial court discussed in detail the facts set forth by the Thyes and Newcastle and set forth which facts were uncontroverted and which facts were immaterial. The trial court ultimately determined that there was no evidence to support tortious conduct by the Thyes in their relationship with Newcastle or

with Dressler and Alpha Homes and that the parties had settled their issues concerning the breach of contract by the February 2006 cancellation and mutual release agreement. As a result, the trial court granted summary judgment to the Thyes on all of Newcastle's claims against them. In addition, the trial court granted summary judgment to Newcastle on all of the Thyes' counterclaims.

## A. Standard of Review

On appeal, Newcastle argues that the trial court erroneously granted summary judgment to the Thyes. This court's review of a trial court's decision on a motion for summary judgment is well established. When the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law, summary judgment is appropriate. The trial court is required to resolve all facts and inferences which may reasonably be drawn from the evidence in favor of the party against whom the ruling is sought. When opposing a motion for summary judgment, an adverse party must come forward with evidence to establish a dispute as to a material fact. In order to preclude summary judgment, the facts subject to the dispute must be material to the conclusive issues in the case. On appeal, the same rules apply; summary judgment must be denied if reasonable minds could differ as to the conclusions drawn from the evidence. *Miller v. Westport Ins. Corp.*, 288 Kan. 27, 32, 200 P.3d 419 (2009).

## B. No Contract in the Record

When determining that the Thyes were entitled to summary judgment in this case, the trial court went into a detailed analysis of the facts and circumstances set forth by the parties and determined which facts were uncontroverted and which facts were immaterial. In arguing that the trial court erroneously granted summary judgment to the Thyes, Newcastle similarly goes through the particular facts and circumstances and argues that it has brought forth direct and circumstantial evidence to demonstrate genuine issues of material fact to support its claims against the Thyes.

Nevertheless, a review of the appellate record reveals that one of the main problems in this case is that Newcastle has not provided the actual May 2005 contract between it and the Thyes. The contract was not attached to Newcastle's petition, and Newcastle has not quoted any language from the May 2005 contract in its petition. As a result, this court is unaware of the actual provisions of the May 2005 contract.

Newcastle's claims against the Thyes were all based upon the Thyes' alleged breach of the May 2005 contract. For example, Newcastle's attorney conceded at the summary judgment hearing that Newcastle's claims centered on whether there were tortious acts committed by the Thyes, Dressler, and Alpha Homes *that caused a breach of the May 2005 contract.* Newcastle's attorney agreed that its allegations were that there were delays in completing the construction of the house that prevented the closing on the contract closing date and that the Thyes, Dressler, and Alpha Homes had engaged in a deliberate course of action to delay the completion of the home so that the Thyes could escape from their obligation under the May 2005 contract. Newcastle further agreed that it was alleging that the Thyes had made changes to the construction plans, which caused the delays in constructing the house and a breach of the contract.

In order to determine whether there was a genuine issue of material fact established on any of Newcastle's claims centering on the breach of the May 2005 contract, this court would need to see the actual contract and determine whether a breach did occur under the terms of the contract. Without a contract, it is unknown whether the Thyes were authorized to make changes to the construction plans under the contract or whether they were responsible for certain aspects of the construction and additions to the house. Moreover, it is unknown whether, under the May 2005 contract, the Thyes had an absolute right to obtain rescission of the contract under certain circumstances, such as when the builder failed to meet the second extension of the contract deadline. In short, without the May 2005 contract, it would be sheer speculation to determine that the Thyes' actions were not authorized under

the contract and that a breach of the May 2005 contract had occurred.

Further, in order to evaluate whether there was a genuine issue of material fact established as to Newcastle's claims against the Thyes of tortious interference with a contract and tortious interference with a business relationship, this court would need to evaluate the May 2005 contract that existed between Newcastle and Alpha Homes. Based on the pleadings and the evidence produced at the summary judgment stage, Dressler's and Alpha Homes' business relationship with Newcastle stemmed from Newcastle's May 2005 contract with Alpha Homes to construct custom built homes, including the house at 2250 Valley View Drive. Without being able to construe the terms of that May 2005 contract, this court is unable to determine whether the Thyes' alleged actions in requesting additions to the construction plans constituted tortious interference with the contract or with Alpha Homes' and Dressler's business relationship with Newcastle.

As an appellant, Newcastle had the burden to designate a record sufficient to establish the claimed errors. In the absence of such a record, the claims of error fail. See *Kelly v. VinZant*, 287 Kan. 509, 526, 197 P.3d 803 (2008). Here, where Newcastle's claims against the Thyes were based on a breach of the May 2005 sales contract and the May 2005 construction contract between Alpha Homes and Newcastle, the failure of Newcastle to provide those May 2005 contracts at the summary judgment stage was fatal to its claims. Without the May 2005 sales contract between the Thyes and Newcastle and the May 2005 construction contract between Alpha Homes and Newcastle, Newcastle has failed to establish a genuine issue of material fact that there was a breach of the May 2005 sales contract or that the Thyes had tortiously interfered with the May 2005 construction contract or Dressler's and Alpha Homes' business relationship with Newcastle.

C. *Rescission Agreements*

In addition, the undisputed facts in this case establish that Newcastle and the Thyes executed two cancellation and release agreements that cancelled and rescinded the May 2005 contract and any

additions, addendums, and extensions. Moreover, under the cancellation and release agreements, the Thyes and Newcastle agreed to release each other from any liability or claims for damages arising out of the May 2005 contract and any additions, addendums, or extensions to that contract.

By rescinding the May 2005 contract and any additions, addendums, and extensions, the Thyes and Newcastle agreed to discharge each other's duties under the contract. An agreement of rescission is an agreement where "each party agrees to discharge all of the other party's remaining duties of performance under an existing contract." Restatement (Second) of Contracts § 283(1) (1979). Thus, an agreement of rescission "discharges all remaining duties of performance of both parties." Restatement (Second) of Contracts § 283(2). Restatement (Second) of Contracts § 283, comment a, further explains as follows:

> "*Nature of agreement of rescission.* Sometimes the parties to a contract that is at least partly executory on each side make an agreement under which each party agrees to discharge all of the other party's duties of performance. Such an agreement is called an 'agreement of rescission' in this Restatement. Consideration is provided by each party's discharge of the duties of the other. This is so even though one or both parties have partly performed their duties or one or both have a claim for damages for partial breach."

Thus, under an agreement of rescission, the parties can agree to discharge the duties of the other under the contract, even though one or both parties have partly performed their duties or one or both parties have a claim of damages for partial breach.

Our Supreme Court has recognized that "a contract may be discharged at any time before performance is due by a new agreement with the effect of altering the terms of the original agreement or of rescinding it altogether. (17 C.J.S., Contracts, § 394.)" *State, ex rel., v. Board of Education,* 155 Kan. 754, 758, 129 P.2d 265 (1942), *overruled on other grounds Singer v. City of Topeka,* 227 Kan. 356, 607 P.2d 467 (1980). "The promise of one party to forego his [or her] rights under a contract is sufficient consideration for the promise of the other party to forego his [or her] rights. (3 Williston on Contracts, § 1826.)" *State, ex rel.,* 154 Kan. at 758.

Here, there was sufficient consideration for the agreements of rescission because both the Thyes and Newcastle agreed to release their rights and interests in the contract and to release each other from any liability under the contract. In addition, Newcastle provided consideration by promising to pay $20,000 to the Thyes for the improvements, upgrades, and additions made to the property, and the Thyes agreed that such improvements, upgrades, and additions would remain with the property and become the property of Newcastle.

Once the Thyes and Newcastle executed the agreements of rescission, neither party owed any other duties under the May 2005 contract or under any additions, addendums, or extensions to the contract. Moreover, the Thyes and Newcastle agreed to

*"release[] the other from any liability, claim for damages and damages, that they now have or may in the future have against any party to this Agreement arising out of the Residential New Construction Contract dated May 17, 2005, and any additions, addendums or extensions thereto and for any items the [Thyes] added to said house."* (Emphasis added.)

Under the plain terms of the cancellation and release agreements, the Thyes owed no further duties under the May 2005 contract and could not be held liable for *any* claim for damages arising out of the May 2005 contract and any items that the Thyes added to the house. Thus, the Thyes could not be held liable by Newcastle for any alleged breach of the May 2005 contract or for any additions that they made to the construction of the house at 2250 Valley View Drive.

### D.  *Fraudulent Inducement*

In an apparent attempt to get around the rescission agreements, Newcastle argued before the trial court, at the summary judgment stage, that the Thyes had fraudulently induced it to enter into the rescission agreements. There are two problems with this argument. First, Newcastle did not properly plead this cause of action for fraudulent inducement. Second, the evidence presented by Newcastle at the summary judgment stage failed to establish a genuine issue of material fact as to the elements of fraud.

## 1. *Failure to Plead Fraudulent Inducement with Particularity*

Early on in the case, in its answer to Newcastle's amended petition, the Thyes asserted the defense that Newcastle had failed to adequately state a claim for fraud with particularity against them. Later, at the hearing on the motion for summary judgment, the Thyes again asserted that Newcastle never met the specificity in pleading requirements for fraud. This same argument is made by the Thyes in their appellate brief.

Generally, the Kansas Rules of Civil Procedure permit notice pleading. In other words, a pleading is sufficient if it contains "[a] short and plain statement of the claim showing that the pleader is entitled to relief" and "a demand for judgment." K.S.A. 60-208(a). Notwithstanding the general liberality of notice pleading, a plaintiff alleging fraud as a cause of action must state the circumstances constituting fraud with particularity. K.S.A. 60-209(b).

Kansas case law demonstrates that the statutory requirement to plead fraud with particularity is strictly enforced. See *Palmer v. Brown*, 242 Kan. 893, 901, 752 P.2d 685 (1988) (upholding dismissal of fraud claim for failure to plead fraudulent inducements with particularity); *McGill v. Kuhn*, 186 Kan. 99, 104, 348 P.2d 811 (1960) (holding that fraud claim was insufficiently pled because it did not allege knowledge by plaintiffs of alleged intent to defraud defendant); *Vondracek v. Mid-State Co-op, Inc.*, 32 Kan. App. 2d 98, 103, 79 P.3d 197 (2003) (where petition stated pled only two elements of fraud with particularity, trial court did not err in granting summary judgment for failing to plead fraud with particularity).

According to the Pattern Instructions for Kansas, PIK Civ. 4th 127.40, the essential elements required to sustain an action for fraud are:

"1. That false (or untrue) representations were made as a statement of existing and material fact.

"2. That the representations were known to be false (or untrue) by the party making them, or were recklessly made without knowledge concerning them.

"3. That the representations were intentionally made for the purpose of inducing another party to act upon them.

"4. That the other party reasonably relied and acted upon the representations made.

"5. That the other party sustained damage by relying upon them.

"A representation is material when it relates to some matter that is so substantial as to influence the party to whom it was made."

In alleging its action for fraud against the Thyes, Newcastle made conclusory statements that merely set forth the elements of fraud and did not state with particularity the circumstances constituting fraud. Specifically, Newcastle outlined its fraud claim as follows:

"31) Newcastle adopts by reference, all allegations contained in paragraphs 1 through 30, above, as though fully set forth herein.

"32) That false or untrue representations were made by the Thyes as a statement of existing and material fact to Newcastle concerning the Thyes Agreement.

"33) That the representations made by the Thyes concerning the Newcastle were known by them to be false or untrue . . . when they made them.

"34) That the representations were intentionally made by the Thyes for the purpose of inducing Newcastle to act upon them.

"35) That Newcastle reasonably relied and acted upon the representations made [by] the Thyes concerning the Thyes Agreement.

"36) That Newcastle sustained damage by relying upon the representations made by the Thyes concerning their agreement with Newcastle."

Although Newcastle specifically adopted by reference the allegations contained in paragraphs 1 through 30, none of those allegations even mention the February 2006 cancellation and release agreements, which are what Newcastle now seeks to avoid with its fraudulent concealment claim. There are no allegations within Newcastle's fraud claim or the previous paragraphs as to what false or untrue representations were made by the Thyes. In addition, there are no particular facts or circumstances alleged regarding what representations induced Newcastle to enter into the February 2006 cancellation and release agreements. Finally, Newcastle has not set forth particular facts or circumstances as to how it justifiably relied on the Thyes' representations or as to its damages in this case. As a result, Newcastle failed to meet the specificity in pleading requirements for its fraudulent concealment claim.

### 2. *No Genuine Issue of Material Fact as to Fraudulent Inducement*

In addition, based upon Newcastle's argument before the trial court and the evidence presented at the summary judgment stage, Newcastle failed to establish a genuine issue of material fact as to

some of the elements of fraudulent concealment, including that a false or untrue representation was made by the Thyes, and that Newcastle sustained damages by reasonably relying and acting upon the false or untrue representation made.

### a. *No False or Untrue Representation Made*

Newcastle apparently argued before the trial court that the Thyes had made a false or untrue representation that they wanted to rescind the contract because the construction had not been completed by the second extension date of January 23, 2006. The evidence presented at the summary judgment stage, however, failed to show that the Thyes had made a false or untrue representation.

Based on the evidence presented by the parties, the Thyes had agreed to two extensions of the construction completion date, but they refused to agree to a third extension of the construction completion date. The Thyes' realtor contacted Barnes and requested that Newcastle let them out of the contract based on Newcastle's unwillingness or inability to complete the home. The construction completion date, January 23, 2006, came and went without the construction being completed. The Thyes and Newcastle later entered into the rescission agreements to cancel and rescind the May 2005 sales contract and its additions, addendums, and extensions.

Newcastle points to no false or untrue representations that were made by the Thyes. The facts presented by the parties were that the Thyes would not agree to a third extension date, that the construction was not completed by the second extension date of January 23, 2006, and that the Thyes wanted out of the May 2005 sales contract. Under those facts, Newcastle has not shown any false or untrue representations made by the Thyes.

### b. *No Reasonable Reliance to Newcastle's Detriment*

Additionally, Newcastle has not shown that it sustained damages by reasonably relying upon any representations made by the Thyes.

In Barnes' affidavit, he alleged that as a result of rescinding the contract, he had sustained damages in excess of $63,300. Barnes asserted that this money had been used "to pay for the extras that had been improperly included in the construction of the Newcastle

home and to pay contractors to come in and finish the work that Alpha Home and/or Thomas Dressler failed to complete." Further, in arguing before the trial court, Newcastle's attorney contended that the Thyes' additions to the construction plans constituted a breach of the May 2005 sales contract. Newcastle's attorney also contended that the $20,000 it paid to the Thyes under the second rescission agreement was part of its damages in the case.

Nevertheless, upon signing the rescission agreements, Newcastle (through Barnes) had notice that the Thyes had made additions to the property at 2250 Valley View Drive. Specifically, the second cancellation and release agreement provided as follows:

"4. The Seller will pay to the Buyers the sum of $18,000 $20,000.00 [amended/initialed by parties] upon execution of this Agreement by all parties. All upgrades, additions and other improvements to the home located at 2250 Valley View Drive, Tonganoxie, Leavenworth County, Kansas 66086, shall remain with the real property and become the property of the Seller. This includes the wooden fence that fences a portion of the yard at 2250 Valley View Drive, Tonganoxie, Leavenworth County, Kansas 66086."

Moreover, there was also evidence that Barnes had been at the property at 2250 Valley View Drive during January 2006 when the Thyes were painting the property. Indeed, Barnes exclaimed that the home could not be completed by the second extended closing date of January 23, 2006.

With this information, Barnes had the knowledge that the Thyes had allegedly gone outside of the contract and made additions to the construction plans. Barnes cannot now argue that the Thyes were not allowed, under the contract, to make the additions to the contract when he signed off on the rescission agreement that specifically stated that he was paying $20,000 for the improvements to the property. Moreover, as discussed previously, Newcastle has not even brought forth the May 2005 sales contract to show that the Thyes went outside of the terms of the contract.

Further, as an experienced contractor for the sales and construction of custom-built homes, Barnes, as the principal and agent of Newcastle, would have been able to inspect the property and determine that additional work and repair of the Thyes' additions to the construction plans would need to be done before the property

could be sold. See *Katzenmeier v. Oppenlander*, 39 Kan. App. 2d 259, 268, 178 P.3d 66, *rev. denied* 286 Kan. 1178 (2008) (in determining that the plaintiff purchasers could not reasonably rely on the representations of the defendant seller, this court considered the fact that the plaintiffs were experienced owners and managers of multifamily dwellings); *Boegel v. Colorado Nat'l Bank of Denver*, 18 Kan. App. 2d 546, 549-52, 857 P.2d 1362, *rev. denied* 253 Kan. 856 (1993) (in case involving fraudulent concealment claim, this court determined that it would have been reasonable for plaintiff, who was experienced irrigation farmer and experienced businessman in seed and fertilizer business and custom farming business, to inspect irrigation equipment while it was operating and to ask questions about wells before purchasing property).

Based on the uncontroverted evidence in this case, Barnes would have had complete access to the property by January 23, 2006, to determine what additional work would need to be done to complete the construction. Barnes' affidavit established that Dressler pulled his workers from the construction project on January 18, 2006. Further, Barnes apparently concedes that the construction was not completed by January 23, 2006, and that the closing did not occur. Barnes maintained in his affidavit that the painting done by the Thyes to the interior of the house was of such a shoddy condition that the entire interior of the house had to be professionally repainted. If this were true, Barnes should have been put on notice that additional work would need to be performed on the house in order to sell it to another purchaser. As an experienced contractor of the construction of the house, Barnes should have been able to ascertain what had been done to the house, what had been done in contravention of the Thyes' and Alpha Homes' contracts with Newcastle, and what still needed to be completed or repaired before he entered into the rescission agreements.

In summary, any reliance by Barnes was unreasonable. As stated earlier, he had no right to rely that no improper upgrades had been made to the house when the alleged upgrades were within his knowledge before he signed the rescission agreements on February 13, 2006, and paid the Thyes $20,000 for the alleged upgrades.

Under the circumstances present in this case, Newcastle has not established a genuine issue of material fact that it sustained damages by reasonably relying upon any representations made by the Thyes.

### E. *Avoidance*

Finally, it is apparent that the doctrine of avoidance, as set forth in Restatement (Second) of Contracts § 381 (1979), would bar Newcastle's attempts to avoid the February 2006 rescission agreements.

Under Restatement § 381(2), "[t]he power of a party to avoid a contract for misrepresentation or mistake is lost if after he knows of a fraudulent misrepresentation or knows or has reason to know of a non-fraudulent misrepresentation or mistake he does not within a reasonable time manifest to the other party his intention to avoid it." Restatement § 381, comment a, further explains: "A party who has the power to avoid a contract may lose that power by delay alone, even without such conduct as amounts to affirmance (§ 380). Under the rule stated in this Section the power is lost if it is not exercised within a reasonable time."

The application of this doctrine to contracting parties is contained in an example set forth in Illustration 1 to Restatement § 381:

"1. A is induced by B's misrepresentation to contract in January to sell B 1,000 shares of stock in the X Corporation for $100,000, delivery and payment to be on May1. A discovers the fraud in February but does not manifest his intention to avoid the transaction until April. In view of the extent to which A's delay of two months enabled him to speculate at B's expense, A has lost his power of avoidance, and his manifestation is not effective to avoid the transaction."

Here, similar to the above illustration, Newcastle claims that it was induced by the Thyes' misrepresentations to contract in February 2006 to rescind the May 2005 sales contract. Newcastle should have discovered the alleged fraud and damages at the very latest when it was doing the extra work on the property, which would have occurred between the time when Barnes signed the February 2006 rescission agreements and when Newcastle sold the property on March 16, 2006. Newcastle, however, did not file suit

and manifest its intention to avoid the February 2006 rescission agreements until June 2007. In view of Newcastle's delay of 16 months in attempting to avoid the rescission agreements, Newcastle lost its power of avoidance. As a result, its attempt to avoid the rescission agreements were not effective.

If Newcastle wanted to avoid the February 2006 rescission agreements, it could have contacted the Thyes in February or March 2006 when it was doing all the extra work on the property to sell it. At that point, Newcastle would have been aware of the extra money that it had "to pay contractors to come in and finish the work that Alpha homes and/or Thomas Dressler failed to complete" and of any additions that the Thyes had made that were not authorized by the contract. Newcastle could have offered to tender the custom-built home back to the Thyes and place them in the same position that they had been in before the rescission agreements were signed. Nevertheless, it seems that Newcastle chose to make the improvements and to speculate on getting a better sale price for the property, which, in fact, it ultimately did receive. As a result, Newcastle should not be allowed, 16 months after the February 2006 rescission agreements were signed, to avoid the agreements and claim that the Thyes breached the May 2005 sales contract. See *Hoke v. Stevens-Norton, Inc.*, 60 Wash. 2d 775, 778-79, 375 P.2d 743 (1962) (where defendant failed to make demand upon defendant for rescission when he learned true character of transaction, he waived any right to rescind or for damages).

## F. *Reinstatement of Appeal*

Next, the Thyes contend that Newcastle's appeal, after being dismissed by the trial court, was never properly reinstated under Supreme Court Rule 5.01 (2009 Kan. Ct. R. Annot. 33) and Rule 5.051 (2009 Kan. Ct. R. Annot. 36). Therefore, the Thyes argue that the present appeal should be dismissed for lack of jurisdiction.

The right to appeal is purely statutory, and if the record shows that the appellate court does not have jurisdiction, the appeal must be dismissed. *Alliance Mortgage Co. v. Pastine*, 281 Kan. 1266, 1271, 136 P.3d 457 (2006). Whether jurisdiction exists is a question of law over which an appellate court's scope of review is unlimited.

*Shipe v. Public Wholesaler Water Supply Dist. No. 25*, 289 Kan. 160, 165, 210 P.3d 105 (2009). An appellate court has a duty to question jurisdiction on its own initiative. When the record discloses a lack of jurisdiction, it is the duty of the appellate court to dismiss the appeal. *State v. Gill*, 287 Kan. 289, 294, 196 P.3d 369 (2008).

Here, Newcastle filed its notice of appeal from the trial court's March 17, 2009, written decision granting summary judgment to the Thyes on April 20, 2009. On July 15, 2009, the Thyes moved to dismiss Newcastle's appeal based on Newcastle's failure to timely file the docketing statement. The Thyes argued that as of the date of the filing of their motion to dismiss, Newcastle's docketing statement was over 2 months out of time. On October 8, 2009, the trial court filed a journal entry in which it dismissed Newcastle's appeal based on its failure to timely file a docketing statement.

On September 23, 2009, Newcastle filed a second notice of appeal from the trial court's March 17, 2009, decision. On October 14, 2009, Newcastle filed its docketing statement. On November 20, 2009, the Thyes moved for an involuntary dismissal of Newcastle's appeal. The Thyes argued that this court should dismiss Newcastle's appeal because Newcastle had not objected to the dismissal of its appeal and had not moved for reinstatement of its appeal under Rule 5.051.

In its written response to the Thyes' motion for involuntary dismissal, Newcastle contended that when it filed its April 2009 notice of appeal, such notice was premature as there were still claims pending against Dressler and Alpha Homes in the case. Indeed, Dressler was not dismissed from the action until May 13, 2009. The remaining claims against Alpha Homes were resolved by default and were reduced to a judgment on August 28, 2009.

This court denied the Thyes' motion to dismiss and determined that this court did not obtain jurisdiction until a final judgment was entered on August 28, 2009. This court further noted that the Thyes' motion to dismiss was unsigned.

K.S.A. 2009 Supp. 60-2102(a)(4) gives this court jurisdiction to review "[a] final decision in any action, except in an action where

a direct appeal to the supreme court is required by law." A final decision generally disposes of the entire merits of the case and leaves no further questions or the possibility of future directions or actions by the court. *Varney Business Services, Inc. v. Pottroff*, 275 Kan. 20, 29, 59 P.3d 1003 (2002). In addition, in any appeal or cross-appeal from a final decision, any act or ruling from the beginning of the proceedings shall be reviewable. See K.S.A. 2009 Supp. 60-2102(a)(4).

K.S.A. 2009 Supp. 60-2102(c) sets out a procedure for making application for an interlocutory appeal, and this court has the discretion to permit or deny the application. *Rodriguez-Tocker v. Estate of Tocker*, 35 Kan. App. 2d 15, 24-25, 129 P.3d 586, *rev. denied* 281 Kan. 1379 (2006). Nevertheless, no application for an interlocutory appeal was made in this case. Moreover, although the trial court has the option of granting a K.S.A. 60-254(b) certificate, that is, "the court may direct the entry of a final judgment as to one or more but fewer than all of the claims or parties only upon an express determination that there is no just reason for delay and upon an express direction for the entry of judgment," the court did not issue a K.S.A. 60-254(b) certificate in this case. As a result, the time for Newcastle to file an appeal in this case was 30 days from the entry of the final judgment.

Here, the final judgment disposing of all claims in the case was not entered until August 28, 2009, when the trial court entered a default judgment against Alpha Homes. Thus, when Newcastle filed its first notice of appeal on April 2009, there was no final judgment from which to appeal.

Under Rule 2.03 (2009 Kan. Ct. R. Annot. 10), a premature notice of appeal is to be treated as if the notice of appeal had been filed simultaneously with the entry of judgment:

"A notice of appeal filed subsequent to an announcement by the judge of the district court on a judgment to be entered, but prior to the actual entry of judgment as provided in K.S.A. 60-258, shall be effective as notice of appeal under K.S.A. 60-2103 if it identifies the judgment or part thereof from which the appeal is taken with sufficient certainty to inform all parties of the rulings to be reviewed on appeal. Such advance filing shall have the same effect for purposes of the appeal as if the notice of appeal had been filed simultaneously with the actual entry of judgment, provided it complies with K.S.A. 60-2103(b)."

Our Supreme Court has extended Rule 2.03 to hold that "if a judgment is entered disposing of all claims against one of multiple parties, and a premature notice of appeal has been filed and has not been dismissed, then a final judgment disposing of all claims and all parties validates the premature notice of appeal concerning the matters from which the appellant appealed." *Honeycutt v. City of Wichita*, 251 Kan. 451, 462, 836 P.2d 1128 (1992). Thus, under *Honeycutt*, Newcastle's April 2009 notice of appeal, if it had not been dismissed by the trial court, would have been validated when the trial court filed its final judgment that finally disposed of all claims in the case on August 28, 2009.

Because the trial court in this case dismissed Newcastle's April 2009 notice of appeal, it was proper for Newcastle to file a new notice of appeal after the trial court entered a final judgment in the case. Newcastle's September 2009 notice of appeal was properly filed within 30 days from "entry of the judgment" as required by K.S.A. 60-2103(a) and adequately satisfied the requirements of K.S.A. 60-2103(b). Under such circumstances, this court had jurisdiction over Newcastle's appeal.

Affirmed.